892 P.2d 611

Ronald E. **ANDREWS** and Jill Andrews, husband and wife, and Golden Aspen Rally, Inc., a New Mexico corporation, Plaintiffs–Appellants,

v.

Charles **STALLINGS**, a/k/a Chuck Stallings, and Frankie Jarrell, each individually and as employees of The Ruidoso News, and Raljon Publishing, Inc., d/b/a The Ruidoso News, a New Mexico corporation, Defendants–Appellees.

No. 15238.

Court of Appeals of New Mexico.

Feb. 14, 1995.

Charles W. Durrett, Charles W. Durrett, P.C., Alamogordo, for plaintiffs-appellants.

William S. Dixon, Charles K. Purcell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendants-appellees.

## OPINION

BLACK, Judge.

Ronald Andrews ("Andrews"), Jill Andrews, and Golden Aspen Rally, Inc. ("the Corporation") filed suit against Raljon Publishing, Inc., owner of the *Ruidoso News*, Frankie Jarrell ("Jarrell"), editor and general manager of the *Ruidoso News*, and Charles Stallings ("Stallings"), a reporter for that newspaper. Plaintiffs sued for defamation, intentional infliction of emotional distress, invasion of privacy, and prima facie tort. Plaintiffs' claims are based upon a series of articles, editorials, and statements that they allege presented false accounts of public proceedings and drew unfair inferences from Andrews' actions as both a member of the Ruidoso Village Council ("the Village Council") and promoter of the Golden Aspen Motorcycle Rally ("the Motorcycle Rally"). After entertaining both briefs and oral argument, the district court dismissed the complaint. We affirm.

## I. DEFAMATION

Plaintiffs allege that beginning the second year Andrews was on the Village Council, Defendants, "with reckless disregard and malice, published false, unfair and inaccurate accounts of public proceedings, more particularly with respect to the meetings of the Ruidoso Village Council, which accounts have contained repeated claims or innuendo of malfeasance of office on the part of plaintiff, Ronald E. Andrews, all with the intent to injure the good standing of said plaintiff." Plaintiffs further allege that Defendants "negligently, recklessly, and maliciously published defamatory statements relating to plaintiffs Jill Andrews and Golden Aspen Rally, Inc., which statements were understood to be defamatory, but which were false." Defendants' allegedly defamatory statements deal generally with the authors' opinions regarding the operation of the Village of Ruidoso and the use of Andrews' elected governmental position to promote the Motorcycle Rally.

Initially, we consider the common law tort of defamation and the limitations placed upon that tort by the First Amendment, U.S. Constitution Amendment I. At common law, a statement is considered defamatory "if it has a tendency to render the party about whom it is published contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him." *Bookout v. Griffin*, 97 N.M. 336, 339, 639 P.2d 1190, 1193 (1982). "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (Second) of Torts § 566 (1976) [hereinafter Restatement]; *cf. Marchiondo v. Brown*, 98 N.M. 394, 404, 649 P.2d 462, 472 (1982) (difference between fact and opinion depends on whether ordinary person would understand words as expression of speaker's or writer's opinion, or as statement of existing fact).

In 1964, the United States Supreme Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

*New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). The *Sullivan* decision constitutionalized the common law tort of defamation. "It set a single standard for libel suits by public officials against the press in every court in the nation." Robert D. Sack & Sandra S. Baron, *Libel, Slander, and Related Problems* 7 (2d ed. 1994) [hereinafter Sack & Baron].

*Sullivan* and its progeny are based on the premise that "[i]t is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1305 (8th Cir.) (en banc), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). Indeed, the right to criticize public officials "lies near the core of the First Amendment." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978). Thus, at least since *Sullivan*, fiery political dialogue, rhetoric, and public debate have been protected under the First Amendment. *See Mendoza v. Gallup Indep. Co.*, 107 N.M. 721, 725, 764 P.2d 492, 496 (Ct.App. 1988). Therefore, the courts have been "particularly assiduous in using protections given opinion by common and constitutional law as tools to shelter strong, even outrageous, political speech." Sack & Baron, *supra*, at 226.

■ "The actual malice requirement was thought to be necessary, because if the makers of some inevitably false statements about public officials (that is, statements made without actual malice) were not insulated from defamation liability, then there would be substantial danger that the first amendment rights of speakers would be unduly chilled." Arlen W. Langvardt, *Media Defendants, Public Concerns, and Public Plaintiffs: Toward Fashioning Order from Confusion in Defamation Law*, 49 U.Pitt.L.Rev. 91, 96 (1987). The failure to dismiss an unwarranted libel suit might necessitate long and expensive trial proceedings that would have an undue chilling effect on public discourse. *See Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C.1983) (per curiam) (on issues of public

importance where even nonmeritorious claim may stifle robust debate, motion to dismiss is appropriate exercise for the court); *see also State v. Powell*, 114 N.M. 395, 398, 839 P.2d 139, 142 (Ct.App.1992) (recognizing chilling effect of criminal libel statute). Therefore, "every defamation action governed by *New York Times Co. v. Sullivan* contemplates a threshold, constitutional inquiry by the court concerning whether the publication at issue is reasonably capable of bearing a false, defamatory meaning." C. Thomas Dienes & Lee Levine, *Implied Libel, Defamatory Meaning, and State of Mind: The Promise of New York Times Co. v. Sullivan*, 78 Iowa L.Rev. 237, 281 (1993) [hereinafter Dienes & Levine]; *see, e.g., Chapin v. Greve*, 787 F.Supp. 557, 562 (E.D.Va.1992) (mem. op.) (threshold inquiry is whether article is defamatory), *aff'd sub nom. Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087 (4th Cir.1993); *cf. Marchiondo*, 98 N.M. at 400, 649 P.2d at 468 (courts must determine in the first instance whether alleged statement was constitutionally protected expression). Based on this standard, the trial court should determine, at the earliest possible stage, whether the plaintiff can establish that statements regarding a public figure are (1) false; (2) defamatory; and (3) evidence of actual malice. *See* Dienes & Levine, *supra*, at 281–83.

■ The *Sullivan* standard applies to Andrews as an elected official. *See Garrison v. Louisiana*, 379 U.S. 64, 67, 85 S.Ct. 209, 212, 13 L.Ed.2d 125 (1964). Where public figures are involved in issues of public concern, the Constitution contemplates a bias in favor of free speech. This bias sometimes works to the detriment of the right of public figures to obtain compensation for damage to their reputations. *See Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

It is within this legal framework that we measure Plaintiffs' allegations.

### A. *February 14, 1991*

■ Plaintiffs identify an article regarding the departure of the city manager, Charles Norwood, as the opening salvo in Defendants' "pattern of malicious, reckless and bad faith conduct, in both investigation and re-

porting, with the purpose and effect of defaming the good characters and reputations of plaintiffs." The article rhetorically raises ten questions as to why Norwood might have resigned. Plaintiffs specifically target question seven, "Did you, Mr. Norwood, get tired of the village's appearance of impropriety by having the same people serve on several boards where money switches hands." However, because defamatory statements must be "concerning the plaintiff[,]" SCRA 1986, 13–1002(B)(3) (Repl.1991), none of the Plaintiffs has a legal basis to complain about the question regarding the "village's appearance of impropriety."

In *Sullivan,* the jury found that readers of a New York Times advertisement could fairly infer that the accusations of misconduct made against the police actually defamed Sullivan as Commissioner of Public Affairs. The United States Supreme Court rejected this finding of the Alabama jury and the state appellate courts that affirmed it, saying:

> There is no legal alchemy by which a State may thus create the cause of action that would otherwise be denied for a publication which, as respondent himself said of the advertisement, "reflects not only on me but on the other Commissioners and the community." Raising as it does the possibility that a good-faith critic of government will be penalized for his criticism, the proposition relied on by the Alabama courts strikes at the very center of the constitutionally protected area of free expression. We hold that such a proposition may not constitutionally be utilized to establish that an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations.

*Sullivan,* 376 U.S. at 292, 84 S.Ct. at 732 (footnote omitted); *see also Rosenblatt v. Baer,* 383 U.S. 75, 83, 86 S.Ct. 669, 674, 15 L.Ed.2d 597 (1966) ("A theory that the column cast indiscriminate suspicion on the members of the group responsible for the conduct of this governmental operation is tantamount to a demand for recovery based on libel of government, and therefore is constitutionally insufficient.").

■ This does not mean that the First Amendment should be read to automatically prohibit actions for group defamation, even if the group is composed of government officials. *See Brady v. Ottaway Newspapers, Inc.,* 84 A.D.2d 226, 445 N.Y.S.2d 786, 793 n. 4 (1981). However, "[i]n a close case on the issue of whether defamatory speech is 'of and concerning' an individual or the government itself, it should be construed as of and concerning the government." Rodney A. Smolla, *Law of Defamation* § 2.28[3], at 2–99 (1994) [hereinafter Smolla]. Thus, when the criticism can legitimately be interpreted as criticism of a government entity, rather than a government official, the First Amendment requires adoption of the former interpretation. *Id.; see* Sack & Baron, *supra,* at 164–65; *see also* Laurence H. Tribe, *American Constitutional Law* § 12–12, at 863 (2d ed. 1988) ("[B]ecause critical discussion of government ordinarily involves attacks on individual officials as well as impersonal criticisms of government policy, all defamation claims of aggrieved public officials must be examined closely in order to close what would otherwise be a back door to official censorship."). The statement challenged by Andrews regarding "the Village's appearance of impropriety" is, on its face, criticism of a government entity and therefore is not a proper basis for a defamation claim by a government official. *See Saenz v. Morris,* 106 N.M. 530, 534, 746 P.2d 159, 163 (Ct. App.) (impersonal criticism of government is not libel of government official), *cert. denied,* 106 N.M. 511, 745 P.2d 1159 (1987); *cf. Johnson v. Delta–Democrat Publishing Co.,* 531 So.2d 811, 815 (Miss.1988) (editorial focusing on city council did not defame defendant individually).

■ Plaintiffs also complain about the statement: "And then there's Councilor Andrews who helped approve the members on the Lodgers Tax Committee and their budget, only to receive $3,000 from the same tax committee to help advertise his Golden Aspen (motorcycle) Rally, a for-profit corporation." The complaint alleges that this statement "implies malfeasance in office, which is untrue and unjustified." Andrews does not allege, however, that anything in the statement is untrue. These allegations are insuf-

ficient. "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison,* 379 U.S. at 74, 85 S.Ct. at 216. Thus, the First Amendment requires that "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986). Since Plaintiffs do not claim that the statements are untrue, the mere allegation that such statements imply malfeasance is insufficient to support a claim of defamation.

### B. *April 22, 1991*

■ The *Ruidoso News* published an article by Stallings titled, "LTC could be the goose that laid the golden egg for some." Without specifying any particular statement, the complaint alleges that the article "inaccurately states facts and declares an inaccurate conflict of interest on the part of Andrews in the performance of his official duties, and further implies misrepresentation on the part of Ron Andrews, individually, in the preparation of the financial statement for plaintiff, Golden Aspen Rally, Inc."

Initially, we note that Defendants do not bear the burden to discern how this article has defamed Plaintiffs. Rather, the latter "must plead precisely the statements about which they complain." *Royal Palace Homes, Inc. v. Channel 7,* 197 Mich.App. 48, 495 N.W.2d 392, 396 (1992); *see also Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 728 n. 6 (1st Cir.) (because defendant is entitled to know precise language challenged, plaintiff is limited to complaint in defining scope of defamation), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992); *cf.* Smolla, *supra,* § 12.05[5], at 12–26.1 (defamation pleading requirements have "a tradition of greater factual detail and specificity with regard to most elements of the complaint than might otherwise be true in civil actions"). Reading the April 22, 1991 article, there is no statement which is so obviously defamatory as to require us to reverse the judgment of the district court. *See Bitsie v. Walston,* 85 N.M. 655, 659, 515 P.2d 659, 663 (Ct.App.) ("A defamatory

meaning will not be given to words unless such a meaning is their plain and obvious import."), *cert. denied,* 85 N.M. 639, 515 P.2d 643 (1973).

Second, the factual statements are ·true and therefore the "implication of misrepresentation" cannot constitutionally serve as the predicate for a defamation complaint by a public official regarding a matter of public concern. *See Garrison,* 379 U.S. at 74, 85 S.Ct. at 215–16; *see also Strada v. Connecticut Newspapers, Inc.,* 193 Conn. 313, 477 A.2d 1005, 1012 (1984) ("The media would be unduly burdened if, in addition to reporting facts about public officers and public affairs correctly, it had to be vigilant for any possibly defamatory implication arising from the report of those true facts.")

### C. *September 26, 1991*

The *Ruidoso News* published an editorial titled, "Law and order took a vacation." Plaintiffs argue that the article is untrue and "implies disloyalty and malfeasance" based on the statement in the article that: "We don't agree with Ruidoso's mayor and council and Ruidoso Downs' mayor who say that the problems [with the Motorcycle Rally] were no big deal." Plaintiff's challenge to this editorial contains at least two infirmities.

■ First, we again note that this statement does not refer to any Plaintiffs individually, but rather to the "mayor and council." Therefore, this statement is insufficient to support Plaintiffs' claim of defamation against them personally.

■ Second, the statement was advanced in an editorial context, which indicated that it was a forum for the expression of opinion, not the recitation of fact. *See generally* Smolla, *supra,* § 6.08[3][c], at 6–28 to –34 (discussing "fact/opinion problem"). Although confusion existed over whether opinion on such public matters was constitutionally protected per se prior to 1990, the United States Supreme Court addressed the problem in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). That case involved a high school wrestling coach, Milkovich, who brought a defamation action in state court against a local newspa-

per based on a column that discussed an investigation of an incident in which the coach was involved. The column concluded:

> Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.
>
> But they got away with it.
>
> Is that the kind of lesson we want our young people learning from their high school administrators and coaches?
>
> I think not.

*Id.* at 5 n. 2, 110 S.Ct. at 2699 n. 2.

The *Milkovich* Court refused to recognize a per se "First Amendment-based protection for defamatory statements which are categorized as 'opinion' as opposed to 'fact.'" *Id.* at 17, 110 S.Ct. at 2704. However, the Court continued to recognize the truth requirement of *Hepps,* 475 U.S. at 775, 106 S.Ct. at 1563, saying:

> Foremost, we think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved. Thus, unlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.

*Milkovich,* 497 U.S. at 19–20, 110 S.Ct. at 2706 (footnote omitted).

*Milkovich* did not, then, eliminate constitutional protection for political opinion, "[r]ather, the Court chose to articulate the constitutional rules in terms of the requirement that state defamation actions be based upon statements of fact provable as false." Smolla, *supra,* § 6.01[2], at 6–4.1 to 6–5. Moreover, *Milkovich*'s reliance on *Hepps* furthered the requirement that it is the plaintiff who must allege and prove the actual falsity of the statements, "when the plaintiff is a public official or public figure, or when the statements are matters of public concern published by a media defendant." *Moyer v. Amador Valley Joint Union High Sch. Dist.,* 225 Cal.App.3d 720, 275 Cal.Rptr. 494, 497 n. 2 (1990); *see Milkovich,* 497 U.S. at 16, 110 S.Ct. at 2704. Thus, after *Milkovich,* "[o]pinion is not protected per se by the Constitution, yet because opinion can be proved neither true nor false and a plaintiff must prove falsity to succeed, it remains nonactionable as a matter of constitutional law." Sack & Baron, *supra,* at 213.

Whether or not problems with the Motorcycle Rally were a "big deal" is not something Plaintiffs can prove to be false. *See Moyer,* 275 Cal.Rptr. at 497 (terms "worst teacher" and "babbler" not susceptible of being proved true or false). Under *Milkovich,* therefore, the editorial statement challenged by Plaintiffs is not actionable.

### D. *April 22, 1992*

■ Plaintiffs' complaint also alleges:
Stallings stated to others that the Ruidoso Police had been told to refrain from restricting the activities of the motorcyclists, because it might precipitate altercations, which might in turn cause Ron Andrews' (implying the Golden Aspen Rally, Inc.) liability insurance to increase, thereby implying a malfeasance of office or undue influence on the part of Counselor Ron Andrews, and which statement was untrue.

Once again, even assuming that Stallings made the described statement and that it was untrue, Plaintiffs were not defamed. Initially, we note that Plaintiffs do not allege that Councilor Andrews or either of the other Plaintiffs told police to refrain from restricting cyclists, so it is difficult to see how any of them are defamed. *See Ferguson v. Watkins,* 448 So.2d 271, 275 (Miss.1984) (defamation must be clearly directed toward plaintiff and "not be the product of innuendo, speculation or conjecture").

■ Moreover, although Councilor Andrews might infer that these statements implied misfeasance in office, such statements disclose the factual basis for Stallings' con-

clusion that the risk of altercations might in turn cause Andrews' liability insurance to increase. Statements recognizable as opinion because the factual premises are fully revealed are not a proper predicate for a defamation claim. *See Phantom Touring,* 953 F.2d at 729–30; *Mathias v. Carpenter,* 402 Pa.Super. 358, 587 A.2d 1, 3 (1991), *appeal denied,* 529 Pa. 650, 602 A.2d 860 (1992). "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be...." Restatement, *supra,* § 566 cmt. c.

### E. *April 30, 1992*

■ The *Ruidoso News* published an article by Stallings titled, "Councilor J.D. James lashes out at board's power play." The opening sentence captures the theme and sets the tone of the article: "An angry Ruidoso Councilor J.D. James scolded Lodgers Tax Advisory Board (LTAB) Chairman Jay Francis Tuesday for what he perceived as a plan to unseat Convention Bureau Director Kathleen Michelena." In the course of the article, however, Stallings wrote:

> The plan to unseat Michelena has been rumored around village hall for many weeks.
>
> . . . .
>
> The speculation is that Nancy Radziewicz, a good friend of Councilor Andrews, also a voting member of the chamber, was the heir apparent for the newly created job, which would duplicate Michelena's job.
>
> Radziewicz and husband, Michael, are long-time friends of Andrews. They sold their West Winds Lodge to the councilor and, according to a statement Andrews made last year, they still carry his mortgage.

Plaintiffs' complaint alleges that these statements were "implying a use of office on the part of Ron Andrews for personal financial protection or gain, which is untrue." However, there is no fair inference that Andrews was doing anything illegal or immoral, only "speculation" that a friend of his might get a job with the convention visitor's bureau. Such a statement is insufficient to support a claim of defamation by a public official. As the Supreme Court of California pointed out when considering a similar claim:

> The implication that [city council members] were motivated by selfish interest rather than the public good is well within the bounds of protected political debate. A statement regarding (1) a public official's business, social, or political affiliations, and (2) how those affiliations seem reflected in decision-making hardly constitutes a libelous charge of bribery and corruption.

*Okun v. Superior Court,* 29 Cal.3d 442, 175 Cal.Rptr. 157, 162, 629 P.2d 1369, 1374 (Cal.) (en banc) (citation omitted), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 673, 70 L.Ed.2d 641 (1981). Moreover, any implication of impropriety is once again based on disclosed facts, which allows readers to form their own opinions and would therefore not even meet common law defamation standards. *Phantom Touring,* 953 F.2d at 730–31; *see* Restatement, *supra,* § 566 cmt. c.

■ The April 30, 1992 issue of the Ruidoso News also carried an article under the headline, "Quick thinking really pays off." This article discusses how Lodgers Tax Advisory Board Chairman Jay Francis called the previous year's budget, "a run away horse" and attempted to "recapture the spirit of LTC funding with new addendums to the LTC resolution." The complaint alleges that the "article states[:] 'Francis had said that organizations like Councilor Ron Andrews' Golden Aspen Motorcycle Rally should not receive lodgers tax money', which statement is untrue, and the article further inaccurately and unfairly states what occurred at the Village Council meeting, implying malfeasance in office on the part of Councilor Ron Andrews."

This allegation is, at the least, ambiguous. Are Plaintiffs alleging that Francis did not say the Rally should not receive lodgers tax money or that it is untrue that the Rally should not receive such funding? Defendants are not obligated to guess how this statement is untrue, how the article "inaccurately and unfairly states what occurred at the Village Council meeting," or how it was "implying malfeasance in office on the part of

Councilor Ron Andrews." Our courts will not strain to find defamation. *See Bitsie*, 85 N.M. at 659, 515 P.2d at 663.

### F. *May 11, 1992*

■ The *Ruidoso News* published an editorial captioned, "What happened?" The editorial begins: "Ruidoso's Village Council is battling the budget, conducting hearings to form next year's financial plan and chip away at what Mayor Victor Alonso said is an $800,-000 deficit." The editorial also asks: "[W]hat have these guys been doing while the deficit creeped up near the million dollar mark?" Plaintiffs claim these statements imply "that the council had allowed or approved a budget which resulted in an $800,000 deficit, which is untrue, as opposed to balancing the budget, thereby implying a failure or misrepresentation in the performance of official duties."

Contrary to Plaintiffs' assertions, no such implication is required and such statements are not defamatory in the context of discussing the expenditure of public funds by public officials. *See, e.g., Kotlikoff v. Community News*, 89 N.J. 62, 444 A.2d 1086, 1091–92 (1982) (letter to the editor speculating that plaintiff mayor and city tax collector could be "engaged in a huge coverup" is protected opinion). And, once again, the statements about which Plaintiffs complain relate to actions allegedly taken by the government, i.e., the Village Council and the Mayor, not the Plaintiffs personally.

### G. *June 22, 1992*

■ An article by Stallings titled, "Councilor Ron Andrews lines out area law officers" and another captioned, "Councilor misuses his office" appeared in the June 22, 1992 edition of the *Ruidoso News*. Plaintiffs allege that these articles "misrepresent what occurred at a Village Council meeting, misquote statements made by Andrews, and further inaccurately indicate that the council inadequately budgeted for and funded law enforcement." Once again, Plaintiffs' failure to specify in what particular way these statements were untrue justifies the district court's dismissal.

■ The June 22, 1992 edition of the *Ruidoso News* also carried a sketch of the new Civic Events Center with the caption:

Councilor Ron Andrews' Golden Aspen Motorcycle Rally literature promotes that Ruidoso is building the rally a new home, which also happens to be the new Civic Events Center. The literature also claims that the rally is an official Aspenfest event of the Ruidoso Valley Chamber of Commerce. Chamber Officials disagree.

Plaintiffs' complaint alleges: "The statement that the rally is not an official Aspenfest event is untrue, and implies misrepresentation on the part of Ron Andrews, in both his official and individual capacities, as well as on the part of Golden Aspen Rally, Inc." A statement is not, however, necessarily defamatory merely because it is untrue. *See Mead v. True Citizen, Inc.*, 203 Ga.App. 361, 417 S.E.2d 16, 17 (1992). In order to be defamatory, a statement must render the subject "contemptible or ridiculous in public estimation, or expose him to public hatred or contempt." *Bookout*, 97 N.M. at 339, 639 P.2d at 1193. Even if chamber officials disagree over whether the Motorcycle Rally is "an official Aspenfest event," neither Andrews nor the Corporation are defamed by such a disagreement.

This allegation of defamation also appears to be the only claim advanced by the Corporation. While a corporation has the right to bring a claim of defamation, "[w]hether a corporation's standing in the community was actually diminished is not relevant if the publication at issue did not falsely charge the corporation itself with some kind of impropriety...." *Church of Scientology v. Flynn*, 578 F.Supp. 266, 268 (D.Mass.1984). Therefore, this statement is insufficient to support a claim of defamation by either Andrews or the Corporation.

### H. *July 2, 1992*

■ The *Ruidoso News* published an article by Stallings titled, "Taxpayers will pick up tab for rally security." Plaintiffs' complaint challenges this article, arguing that:

[The] article inaccurately implies special treatment for the Golden Aspen Motorcycle Rally, in the security plan for it, as

compared with other Village events, and further indicates malfeasance in office by "Rally owner and Village Councilor, Ron Andrews", in that he "at no point in the discussion declared a conflict of interest, he voted twice", where in fact there was no conflict of interest, and his voting was lawful and appropriate. The article contains other inaccurate statements and innuendos with regard to security for and the cost of the rally.

Merely alleging that the article "implies special treatment for the Golden Aspen Motorcycle Rally" or contains "innuendos with regard to security for and the cost of the rally" is legally insufficient to support a claim of defamation when the matters under discussion are of public interest and involve the expenditure of public funds. The complaint does not allege any of the statements are untrue. *See Garrison*, 379 U.S. at 74, 85 S.Ct. at 215–16. Further, as previously discussed, whether Andrews had a conflict of interest is "actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement, *supra*, § 566.

### I. *July 16, 1992*

■■■ Stallings wrote an article titled, "Where's Batman when you need him?" Plaintiffs again complain that a statement in the article is misleading and inaccurate, and implies malfeasance in office. The statement at issue reads: "In the case of the indispensable motorcycle rally, we both spend and save. The trick is to be sure Andrews gets enough taxpayers' money for his private venture to add to an already handsome profit. . . ."

Along with the article's title and its appearance on the editorial page, the use of terms such as "indispensable," "trick," and "handsome" indicate that this is not a factual statement which can be proven false. *See Hepps*, 475 U.S. at 775, 106 S.Ct. at 1563; *cf. Miskovsky v. Oklahoma Publishing Co.*, 654 P.2d 587, 594 (Okla.) (editorial stating that candidate "sunk to a new low" and his words were "despicable and stupid" insufficient to support defamation claim), *cert. denied*, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).

### J. *August 10, 1992*

■■■ Plaintiffs challenge a statement in an editorial titled, "Looking forward to civic center opening." The editorial focuses on the initial question: "Who can speak 'officially' for the Village of Ruidoso?" In the course of discussing various statements as to when the convention center would open, the editorial states:

> Wicker recalled that this isn't the first time misinformation has been disseminated about the village's new civic events center. A couple of months ago, Councilor Ron Andrews printed in his motorcycle rally brochure that the village had built the center specifically as a home for his event. Apparently that statement was made without being cleared through the Convention and Visitors Bureau, the village manager or the council.

Plaintiffs' complaint alleges that "[s]uch statements are untrue, and are misleading, and imply that Ron Andrews has misused his official position." Once again, a fair reading of the statements do not require such an implication, and the complaint fails to state a constitutionally permissible cause of action.

### K. *August 17, 1992*

■■■ On this date, Frankie Jarrell wrote a piece titled, "The truth shall set you free. . . ." The article begins with a quote from songwriter Bob Dylan, then states: "Funny thing how some people are dying to get their names in the paper while others would give anything to slink off into anonymity. Take politicians, for example." Plaintiffs complain about the following:

> Al Junge wondered the other day what we would write about if we didn't have Councilor Ron Andrews.

> So, Al, what's your point?

> How many village councilors ask for and get tax money to promote their own enterprise? We can think of just one.

> How many councilors helped draft a "special events policy" designed for their

own rowdy event? We can think of only one.

How many councilors don't bother to declare a conflict when issues involving their business come up for debate and vote—issues like auditing lodgers? We know of one who just happens to be a lodger, and instead of declaring a conflict, participated in the debate and voted against audits, saying he wouldn't vote to have himself audited.

How many councilors have gone before the council asking for an amendment to an ordinance affecting land they just purchased? One that we can think of.

How many councilors, when they finally declare a conflict, continue to participate in discussions over their request, and even advise the council how to proceed? Just one.

And, how many Ruidoso councilors have ever threatened to sue the council/village/themselves? We know of two on this council.

We don't make the news; we just print it.

Plaintiffs' complaint alleges that the foregoing "inaccurately and unfairly states or represents the events as they actually occurred, and imply impropriety or malfeasance in office on the part of Ron Andrews." Once again, however, Plaintiffs do not challenge the truth of the factual statements but merely the "implication" of impropriety and malfeasance. Thus, Plaintiffs do not state a claim that can withstand First Amendment scrutiny.

## L. *September 3, 1992*

 Stallings wrote an article titled, "Questions remain over motorcycle rally rules." The article begins:

Ruidoso residents may have the impression that something happened about controlling unruly bikers this year, but not much happened.

Although residents called for the Ruidoso Village Council to institute protections against the violence and destruction that erupted during last year's Golden Aspen Motorcycle Rally, the owner of the event

won't have to do things much differently this year.

The majority of the article reiterates the alleged conflict of interest between Andrews acting both as an owner of the event and as a Village Councilor who supervises the Lodgers Tax Committee and the police department. Among other statements challenged by Plaintiffs are the following:

According to state statutes, no elected municipal officer during his elected term shall acquire a financial interest in any new or existing business venture or business property of any kind when such officer believes or has reason to believe that the new financial interest will be directly affected by his official act.

Violation of the provisions of that statute is grounds for removal or suspension from office.

State statutes also contain a conflict clause that requires an elected official to disclose any conflict of interest to other members before a related vote and to have that conflict recorded in the official minutes.

Andrews appears to have ignored that provision on several occasions such as his votes on lodgers tax allocations that included his own business, and when he vocally opposed any bond requirement or contribution toward police protection from owners of events impacting the village.

The article clearly discloses the factual basis for the conclusion that Andrews apparently ignored the state statute. Thus, these statements are not actionable. *See* Restatement, *supra,* § 566; *cf. Long v. Egnor,* 176 W.Va. 628, 346 S.E.2d 778, 787–88 (1986) (assertion that some threatened action will violate the law is nondefamatory).

## M. *Conclusion*

 For the reasons discussed above, all of Andrews' defamation claims fail. In addition, the Corporation's one claim of defamation, which is based on the June 22, 1992 article, also fails. Finally, we note that we were unable to find any specific allegation that any of the articles defamed Jill Andrews. Since defamation is personal, a plain-

tiff has no cause of action for the defamation of his or her spouse. *See Gugliuzza v. K.C.M.C., Inc.,* 606 So.2d 790, 791–92 (La. 1992).

The district court was correct in dismissing Plaintiffs' defamation claims. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 359 (1990) ("When the claim alleged is a traditionally disfavored 'cause of action,' such as malicious prosecution, libel, or slander, the courts tend to construe the complaint by a somewhat stricter standard and are more inclined to grant a Rule 12(b)(6) motion to dismiss.").

## II. *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

In recent years, public figures increasingly have attempted to use the intentional infliction of emotional distress claim "to make an end-run around the obstacles posed by defamation law's harm to reputation element and its constitutional aspects." Arlen W. Langvardt, *Stopping the End–Run by Public Plaintiffs: Falwell and the Refortification of Defamation Law's Constitutional Aspects,* 26 Am.Bus.L.J. 665, 666 (1989) (footnote omitted) [hereinafter *Stopping the End–Run* ]. In *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), the Supreme Court "drastically limited, if not eliminated, public officials' and public figures' ability to employ the emotional distress option to evade the obstacles imposed by defamation law." *Stopping the End–Run, supra,* at 668.

■ Mere insults, especially in the context of a political dispute, do not exceed the bounds of decency. *See Koch v. Goldway,* 817 F.2d 507, 510 (9th Cir.1987). Therefore, "[t]he stringent requirements for stating a cause of action render the tort's usefulness as a weapon against pure expression, particularly by the media, rare." Sack & Baron, *supra,* at 678 (footnotes omitted); *see, e.g., Conroy v. Kilzer,* 789 F.Supp. 1457, 1467–68 (D.Minn.1992) (newspaper article disclosing that fire chief had interests in bars destroyed by possible arson insufficient to support claim).

■ To recover for the intentional infliction of emotional distress a plaintiff must show that the defendant's conduct was extreme and outrageous, and was done recklessly or with the intent to cause severe emotional distress. *Mantz v. Follingstad,* 84 N.M. 473, 480, 505 P.2d 68, 75 (Ct.App.1972), *overruled on other grounds by Peralta v. Martinez,* 90 N.M. 391, 392, 564 P.2d 194, 195 (Ct.App.1977). Extreme and outrageous conduct is "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Restatement (Second) of Torts* § 46 (1965)); *see generally* X.E. "Javier" Acosta, *The Tort of "Outrageous Conduct" in New Mexico: Intentional Infliction of Emotional Harm Without Physical Injury,* 19 N.M.L.Rev. 425 (1989) (discussing history and application of tort of outrageous conduct).

Plaintiffs claim intentional infliction of emotional distress arising from four specific instances.

■ First, Plaintiffs allege that Stallings requested and received from Andrews copies of the Corporation's 1990 tax return. Plaintiffs allege that Stallings then gave information about Plaintiffs to the IRS. As a consequence of Stallings' "report" Plaintiffs claim that the IRS scheduled an audit of both Andrews personally and the Corporation. Plaintiffs allege that these audits were time-consuming, costly, and stressful. We cannot, however, consider it "atrocious" that Stallings contacted the IRS to report his suspicions regarding Plaintiffs' income tax filings. Whatever Stallings' motivations, the law encourages citizens to report any suspected violation of the tax laws to the IRS. *See Barker v. Lein,* 366 F.2d 757, 758 (1st Cir. 1966) (per curiam); *see also* 26 U.S.C. § 7623 (1988) (authorizing payment of fees to such informants). Furthermore, we have not reached the point where a lawful attempt to assist law enforcement agents is considered odious. *See Saunders v. Board of Directors, WHYY–TV,* 382 A.2d 257 (Del.Super.Ct.1978). Therefore, such actions are not "beyond all possible bounds of decency."

 Second, Plaintiffs allege that "defendants, and more particularly Chuck Stallings, have repeatedly attempted to interfere with or prevent the 1992 Golden Aspen Rally convention, by making [sic] and reporting that the insurance coverage therefore was totally inadequate for the event." Plaintiffs allege that Defendants accomplished this by making "reports" to the New Mexico Department of Insurance as well as "to public officials and local citizens of the Village of Ruidoso, and to the Naughton Insurance Company," which had previously insured the Motorcycle Rally. It was not, however, "beyond all possible bounds of decency" for Stallings to contact the New Mexico Department of Insurance or Plaintiffs' insurance carrier while attempting to determine if the coverage was adequate. *Cf. Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735, 740–42, 480 N.E.2d 349, 354–55 (1985) (publication of confidential, but lawfully obtained, matrimonial court files is not outrageous).

 Third, Plaintiffs claim that Stallings wrote and published an article on July 9, 1992, which reported that "high density development has been proposed for prime property across from White Mountain Meadows[.]" This property had been purchased by Andrews and his wife. Plaintiffs allege that the article "resulted in a protest by an adjacent land owner, who then accused the Village Council of impropriety, and thereby caused repeated confusion and delay in the lawful and appropriate lifting of a village ordinance as to such land, and resulted in a cloud on the title to the property and Ron Andrews' and Jill Andrews' inability to negotiate or complete the sales of two parcels within that property." A zoning request to a public board is, however, newsworthy. *See Walters v. Linhof*, 559 F.Supp. 1231, 1237 (D.Colo.1983) (mem. op.). Thus, coverage of such an event cannot be considered "utterly intolerable," as Plaintiffs claim.

 Fourth, the August 13, 1992 edition of the *Ruidoso News* carried an article by Stallings captioned, "Councilor Ron Andrews threatens to sue village." In this article Stallings wrote:

Andrews failed in his bid at the council meeting Tuesday to delete a 1983 provision

tied to his five-acre tract that limits lot size to no less than one acre.

However, he said he intends to proceed with plans even if the final determination has to be brought before the courts.

That would have councilor Andrews suing the village he represents, which could be a bad political move if he intends to run for office in the future.

As a general proposition, accurate publication of newsworthy events does not give rise to a cause of action for intentional infliction of emotional distress. *See McNamara v. Freedom Newspapers, Inc.*, 802 S.W.2d 901, 905 (Tex.Ct.App.), *writ denied* (June 12, 1991). More importantly, even if Andrews' statements were not intended as a threat, reporting his actual statements and concluding that the statements constituted a threat to sue the Village could hardly be "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *See, e.g., Koch v. Goldway*, 607 F.Supp. 223, 226 (C.D.Cal.1984) (rhetorical hyperbole in political dispute does not exceed bounds of decency), *aff'd*, 817 F.2d 507 (9th Cir.1987).

The district court was correct in dismissing Plaintiffs' claim of intentional infliction of emotional distress.

### III. *INVASION OF PRIVACY*

 New Mexico recognizes the tort of invasion of privacy. *McNutt v. New Mexico State Tribune Co.*, 88 N.M. 162, 165, 538 P.2d 804, 807 (Ct.App.), *cert. denied*, 88 N.M. 318, 540 P.2d 248 (1975). The tort is generally broken down into four categories: false light, intrusion, publication of private facts, and appropriation. *See Moore v. Sun Publishing Corp.*, 118 N.M. 375, 383, 881 P.2d 735, 743 (Ct.App.), *cert. denied*, 118 N.M. 430, 882 P.2d 21 (1994). Plaintiffs' claim that Defendants placed them in a "false light."

 "False light" invasion of privacy is "a close cousin of defamation." Smolla, *supra*, § 10.01[2], at 10–3. In the absence of proof of a specific false statement of fact, "[u]nfairness, improper tone, or unfounded implication or innuendo, even though they might sound as though they fit the phrase

'false light,' will no sooner support a recovery for false-light invasion of privacy than for defamation." Sack & Baron, *supra*, at 565. Thus, public figures involved in matters of public concern must hurdle the same constitutionally-based limitations on false light recovery as apply to defamation claims. *See Neish v. Beaver Newspapers, Inc.*, 398 Pa.Super. 588, 581 A.2d 619, 624–25 (1990), *appeal denied*, 527 Pa. 648, 593 A.2d 421 (1991); *see also Hardge–Harris v. Pleban*, 741 F.Supp. 764, 776 (E.D.Mo.1990) (discussing relationship between false light and defamation), *aff'd*, 938 F.2d 185 (8th Cir.1991). "[T]he right of privacy is [therefore] generally inferior and subordinate to the dissemination of news." *Blount v. T D Publishing Corp.*, 77 N.M. 384, 389, 423 P.2d 421, 424 (1966).

■ While we are not willing to accept Defendants' invitation to abolish this version of the tort, Professor Kelso's observation that, "[i]n the overwhelming majority of cases, false light is simply added on at the end of the complaint to give the complaint the appearance of greater weight and importance[,]" appears to be apropos in the present case. J. Clark Kelso, *False Light Privacy: A Requiem*, 32 Santa Clara L.Rev. 783, 785 (1992). The body of Plaintiffs' complaint does almost nothing to elucidate this claim. Although the claim appears to be by all Plaintiffs, only individuals, not corporations, have a right to seek recovery for invasion of privacy. *See Clinton Community Hosp. Corp. v. Southern Md. Medical Ctr.*, 374 F.Supp. 450, 456 (D.Md.1974), *aff'd*, 510 F.2d 1037 (4th Cir.), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). Therefore, the district court properly dismissed any such claim asserted by the Corporation.

■ Once again, as we did when discussing Plaintiffs' related defamation claims, we must note that Defendants do not bear the burden to discern how they have defamed Plaintiffs or placed them in a false light. Our review of the complaint discloses no obvious basis for a legally cognizable claim of false light invasion of privacy. Because the tort requires "publicity," the report to the IRS and investigation of or reports regarding Plaintiffs' insurance do not qualify.

*See, e.g., Hardge–Harris*, 741 F.Supp. at 776 (reporting suspicion of wrongdoing to appropriate authorities not a basis for false light invasion of privacy claim). With regard to the media coverage of Plaintiffs' planned property development and the report of Andrews' potential suit against the Village, these are matters of public concern and, absent the showing required by *New York Times Co. v. Sullivan*, cannot be attacked under the false light rubric.

The district court was correct in dismissing Plaintiffs' invasion of privacy claim.

## IV. PRIMA FACIE TORT

■ New Mexico first recognized a cause of action for prima facie tort in *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990). The elements of prima facie tort are: (1) defendant's lawful but intentional act; (2) defendant's intent to injure the plaintiff; (3) injury to the plaintiff; and (4) no justification for defendant's acts. *Id.* at 394, 785 P.2d at 734. The purpose of this newly recognized tort is "to provide remedy for intentionally committed acts that do not fit within the contours of accepted torts[.]" *Id.* at 396, 785 P.2d at 736. Thus, "prima facie tort should not be used to evade stringent requirements of other established doctrines of law." *Id.* at 398, 785 P.2d at 738; *accord Yeitrakis v. Schering–Plough Corp.*, 804 F.Supp. 238, 249 (D.N.M.1992) ("*Prima facie* tort should not be permitted to duplicate, or remedy a defect in, another established cause of action.").

■ "Attempts to use a prima facie tort theory to overcome obstacles to suits for defamation or injurious falsehood have typically failed." Sack & Baron, *supra*, at 673–74. Thus, it also does not make sense to allow recovery under this new label for expressions that are protected against defamation claims. *See National Nutritional Foods Ass'n v. Whelan*, 492 F.Supp. 374, 384 (S.D.N.Y.1980); *see also* James P. Bieg, *Prima Facie Tort Comes to New Mexico: A Summary of Prima Facie Tort Law*, 21 N.M.L.Rev. 327, 369 (1991) ("[I]t would be incongruous to allow prima facie tort to eliminate a requirement or restrictive feature of

a traditional tort, such as defamation, which expresses an important public policy—freedom of speech."). In the present case it is clear that prima facie tort is being asserted merely to circumvent the established defenses to defamation.

■ Plaintiffs allege that Stallings provided information he had received from Plaintiffs regarding the Corporation's tax filings to the IRS, which led to an IRS audit. The law, however, does not support recovery in prima facie tort for Defendants' alleged reports to either the IRS or the New Mexico Department of Insurance. *See, e.g., Quigley v. Hawthorne Lumber Co.,* 264 F.Supp. 214, 219 (S.D.N.Y.1967) (allegations that defendants furnished false reports leading to plaintiff's wrongful arrest insufficient to support prima facie tort claim).

■ With respect to Plaintiffs' complaint regarding Defendants' coverage of Andrews' statements as a Village Councilor and the "high density" development, such coverage cannot be said to be "without justification." It is the role of a newspaper to report newsworthy events.

The district court was correct in dismissing Plaintiffs' claim of prima facie tort. *See Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 n. 9 (Mo.1993) (en banc) (although prima facie tort claim is normally not discarded until claim is submitted on another ground, it may be dismissed at pleading stage when claim is clearly being asserted merely to circumvent established law).

## V. CONCLUSION

Defendants' allegedly defamatory statements against Andrews are all either protected opinion under the common law or are within the boundaries of First Amendment protection. Furthermore, we do not find any statements that could legitimately be read as defamatory of either the Corporation or Jill Andrews. Defendants' reports to public authorities regarding their concerns over Plaintiffs' taxes and insurance coverage are insufficient to support claims of intentional infliction of emotional distress, false light invasion of privacy, or prima facie tort.

We affirm the dismissal of Plaintiffs' complaint.

IT IS SO ORDERED.

ALARID, J., concurs.

HARTZ, J., specially concurs.

HARTZ, Judge (specially concurring).

I concur in the result. I join in Sections II, III, and IV of Judge Black's thorough and thoughtful opinion. I also join in much of Section I. In particular, I agree that a complaint alleging defamation against a public official must be precise regarding (1) what statement in a newspaper article or editorial is false and (2) in what respect the statement is false. As I read the complaint, the alleged problem with the articles and editorials is that they suggested that what happened constituted misconduct by Andrews. But the complaint does not adequately allege that the newspaper either (1) falsely reported what happened or (2) expressed opinions implying the allegation of undisclosed defamatory facts. *See* Restatement (Second) of Torts § 566 (1976).

Although I agree with the result, I differ with the opinion in one respect. The opinion gives too little weight to context in determining whether a statement is "of and concerning" an individual.

An individual can sue for defamation only if the allegedly defamatory statement is "of and concerning" the individual. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 288, 84 S.Ct. 710, 730, 11 L.Ed.2d 686 (1964). The majority opinion appears to hold that an allegedly libelous statement cannot be "of and concerning" a public official if the statement names only "the village," "the Council," or some other public body, regardless of the nature of the statement or whether the context of the publication establishes that the statement is focused on a particular individual. The majority opinion states: "[W]hen the criticism can legitimately be interpreted as criticism of a government entity, rather than a government official, the First Amendment requires adoption of the former interpretation." Majority Op., 119 N.M. at 484, 892 P.2d at 617.

Such a requirement is unnecessary to protect the First Amendment values espoused by the United States Supreme Court and is not required by Supreme Court precedent. Although there may be sound reasons to abolish defamation actions by public officials, "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy Constitutional protection." *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). "[T]he use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Id.* Given this appraisal by the Supreme Court of false defamatory statements made with actual malice, it would be surprising if the Court cloaked such a statement with immunity just because the person making the statement was careful to refer to the defamed individual only by title rather than by proper name.

Indeed, the two Supreme Court decisions that address the "of and concerning" requirement—*Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) and *Sullivan*—suggest that it is the substance of the criticism (does it focus on government operations or on the individual office holder?) rather than the form (is the individual identified by official title or by proper name?) that matters.

*Rosenblatt* summarized the Supreme Court's position as follows: "[I]n the absence of sufficient evidence that the attack focused on the plaintiff, an otherwise impersonal attack on governmental operations cannot be utilized to establish a libel of those administering the operations." 383 U.S. at 80, 86 S.Ct. at 673. The Court was not immunizing all attacks that name only governmental bodies. For example, the Court wrote: "Were the statement at issue in this case an explicit charge that the Commissioners and Baer or the entire Area management were corrupt, we assume without deciding that any member of the identified group might recover." *Id.* at 81, 86 S.Ct. at 673.

More importantly, the Supreme Court has made clear that an individual may recover for an accusation naming a public entity if surrounding circumstances establish that the attack was directed at the individual. After all, the statement in *Rosenblatt* that impersonal attacks are immune from liability is prefaced by the qualification: "in the absence of sufficient evidence that the attack focused on the plaintiff." Thus, *Rosenblatt* states, "Even if a charge and reference were merely implicit, as is alleged here, but a plaintiff could show by extrinsic proofs that the statement referred to him, it would be no defense to a suit by one member of an identifiable group engaged in governmental activity that another was also attacked." *Id.* at 81–82, 86 S.Ct. at 673–74.

In *Rosenblatt* one of the Court's two holdings was that the trial court had erred by permitting the jury "to infer both defamatory content and reference from the challenged statement itself, although the statement on its face is only an impersonal discussion of government activity." 383 U.S. at 82, 86 S.Ct. at 674. The article at issue did not mention the plaintiff. If the Supreme Court had adopted the view of the panel majority that a statement is privileged if it "can legitimately be interpreted as criticism of a government entity," then the fact that "the statement on its face is only an impersonal discussion of government activity" should have disposed of the entire *Rosenblatt* litigation, because a "legitimate interpretation" of the article is that the plaintiff was not being criticized personally. But the *Rosenblatt* opinion implicitly rejects this view by going on to discuss the plaintiff's "second theory, supported by testimony of several witnesses, ... that the column was read as referring specifically to him[.]" *Id.* at 83, 86 S.Ct. at 674. (The Court then disposed of this theory by holding that "[e]ven accepting [plaintiff's] reading," *id.,* the verdict must be set aside because the plaintiff may have been a public official yet the jury was not instructed that it must find actual malice. *Id.* at 83–88, 86 S.Ct. at 674–77.)

*Sullivan* is consistent with *Rosenblatt.* In *Sullivan* the Supreme Court was reviewing a jury verdict. The Court's conclusion that the newspaper advertisement criticizing the police was not "of and concerning" Sullivan, the police commissioner, did not rest exclusively

on the language of the advertisement, which failed to mention Sullivan by name or official position. The Court wrote: "Although the statements may be taken as referring to the police, they did not on their face make even an oblique reference to [Sullivan] as an individual. Support for the asserted reference must, therefore, be sought in the testimony of [Sullivan's] witnesses." *Id.* 376 U.S. at 289, 84 S.Ct. at 731. The Court then proceeded to review that testimony. *Id.* Such a review would have been totally unnecessary if the Court had adopted the view that the statement is immune from liability if it can be "legitimately interpreted" as not referring to Sullivan personally. The Court would simply have stated that Sullivan had no cause of action because the advertisement could legitimately be interpreted as criticism of the police department rather than as criticism of Sullivan himself.

The panel majority's approach is similar to that of the district court opinion reviewed in *Saenz v. Playboy Enterprises*, 841 F.2d 1309 (7th Cir.1988), *aff'g* 653 F.Supp. 552 (N.D.Ill. 1987). The appellate court summarized the district court's view as being "that a public official may never establish defamation by innuendo where such inferences must be drawn from allegedly defamatory statements which also render a critical assessment of governmental conduct." *Id.* at 1314. That view was rejected on appeal. After analyzing *Sullivan* and *Rosenblatt,* the Seventh Circuit concluded that the Supreme Court had "recognized that a public official could make out a claim where the allegedly defamatory charges were merely implicit, provided the official demonstrates that the accusations were made of and concerning him." *Id.* at 1316. Based on this authority, I do not believe that we can properly dismiss allegations in the complaint on the ground that they were not "of and concerning" Andrews just because the alleged defamatory statement does not mention Andrews by name, particularly when Andrews is mentioned by name later in the same article or editorial, or even in the same paragraph.

I am sympathetic to the panel majority's effort to foreclose any civil action that smacks of a claim for seditious libel. But *Sullivan* and its progeny have already constructed a mighty fortress against such claims. "A vast difference exists between a government's effort to punish speech critical of official policy or acts, where even truth was no defense, and an official's effort to clear his name of an allegation that he acted contrary to official policy and human decency, in a situation in which he must prove both falsity and actual malice." *Sharon v. Time, Inc.,* 599 F.Supp. 538, 555 (S.D.N.Y.1984). In short, the panel majority has engaged in well-intended overkill.